**In re KECK, MAHIN & CATE, Debtor.**

**Bankruptcy No. 97 B 38580.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Dec. 9, 1999.

Larry Wolfson, David Neff, Christy Campbell, Jenner & Block, Chicago, Illinois, for Debtor.

Richard H. Fimoff, Robbins, Salomon & Patt, Chicago, IL, Harvey Greenfield, Laura M. Perrone, Law Firm of Harvey Greenfield, New York, for Jerry Krim.

Daniel Zazove, Barbakoff, Zazove & Glick, Chicago, IL, for Subordinated Debt Holder Comm.

Matthew Botica, Winston & Strawn, Chicago, IL, for Creditors' Committee.

Richard Friedman, Department of Justice, Office of the U.S. Trustee, Chicago, IL, for United States Trustee.

Caren Shulman, Wolf, Block, et al., New York, Eric Prezant, Vedder, Price, et al., Chicago, IL, Kimberly Browaty, Kirkland & Ellis, Chicago, IL, Tom Trombadore, Law Office of Adelman & Gettleman, for Mr. Dennis O'Dea.

### MEMORANDUM OPINION

RONALD BARLIANT, Bankruptcy Judge.

## BACKGROUND

Keck, Mahin & Cate ("Keck" or "the Debtor") was once a leading Chicago law firm with as many as 350 attorneys and 10 offices. In the 1990s, however, the firm's fortunes began to decline and it was never able to recapture its past glory. In 1997, more than a century after the firm began in the practice of law, Keck ceased the representation of clients and continued only in a wind-up capacity. Apparently Keck was unable to wind-up its affairs to the satisfaction of all its creditors, however, because five trade creditors filed an involuntary bankruptcy petition against the firm under chapter 7 of the United States Bankruptcy Code on December 16, 1997.[1] On December 31, 1997, upon Keck's request, the case was converted to chapter 11. Presently before the Court is the confirmation of the Third Amended Joint Chapter 11 Plan ("the Plan"), proposed jointly by Keck and the Official Committee of Unsecured Creditors.

The Plan enjoys broad support by creditors and former partners, but is opposed by two objectors. One is a former partner, who (in common with other partners) holds a secured claim; the other is one of Keck's malpractice insurers, potentially responsible for two substantial claims dealt with in the Plan.

*The Plan* [2]

*Classes of Claims*

The Plan categorizes claims against the estate into 11 classes, only seven of which are expected to receive any distribution. Classes III, IV, VI and VII are of particular importance to the instant confirmation dispute.[3]

II: the secured claims of four banks, The Northern Trust Company, Cole Taylor Bank, LaSalle National Bank, and Bank One ("the Bank Group"), who were potentially liable for preferential and unauthorized post-petition transfers alleged by the Creditors' Committee and others and who resolved this dispute by foregoing their right to any further distribution in exchange for protection against any claim for disgorgement; Class V: unsecured claims of $250 or less; Class VIII: allowed claims that have been subordinated

---

1. Unless otherwise stated, all further statutory references are to the United States Bankruptcy Code, 11 U.S.C. § 101 et seq.

2. The Plan is very complicated and details not relevant to any of the objections are either simplified or not stated in this opinion. In addition, the confirmation of this Plan is a core proceeding under 28 U.S.C. § 157(b)(2)(L).

3. The remaining classes are: Class I: priority claims of §§ 507(a)(3) through (a)(7); Class

Class III consists of the secured claims of partners who lent the Debtor approximately $4,625,000 to pay a portion of the Bank Group's secured loan ("the Sub–Debt Holders"). The loans are secured by security interests, subordinated only to the Bank Group's security interests, in virtually all of the Debtor's assets. The only such asset of any importance is accounts receivable. Since the Bank Group has been satisfied, the Sub–Debt Holders' lien is now senior. Based on alleged inequitable conduct of the Debtor and its partners, the Creditor's Committee and a major creditor have contended that the Sub–Debt claims should be equitably subordinated. As further detailed below, the Plan reflects the settlement of that contention.

Class IV consists of the claims of parties entitled to proceeds of any applicable insurance policy by reason of the settlement of, or judgment on, legal malpractice claims. Two substantial claims fall within Class IV. Any portion of these malpractice claims not satisfied by insurance proceeds will become Class VI claims. Class VI is comprised of general unsecured creditors' claims.

Class VII claims belong to partners who paid a total of $595,493 to settle an action brought by a Chicago landlord ("the Fair Recovery Contributors"). In exchange for that payment, the landlord assigned its claim against the Debtor to the Fair Recovery Contributors.

*Funding and Distribution*

Upon confirmation, the Plan charges two entities with the task of collecting and distributing funds: (1) the Debtor, funded by cash collected from accounts receivable, will distribute funds to administrative claimants and Class III Sub–Debt Holders; and (2) the Plan Administrator, funded by contributions from certain partners ("Participating Partners") and recoveries from non-contributing partners ("Non–Participating Partners"), will distribute funds to Class VI general unsecured claimants and Class VII Fair Recovery Contributors.[4]

After satisfying administrative claims, the first $1.25 million in accounts receivable proceeds collected by the Debtor will be paid to the Plan Administrator, who, in turn, will distribute those funds to Class VI general unsecured creditors. The Debtor will then distribute collected funds in excess of the first $1.25 million plus administrative claims to the Sub–Debt Holders until they have received an aggregate of $1.25 million. After that, the Debtor's available funds would be divided equally between the Sub–Debt Holders and unsecured creditors, but that point is unlikely to be reached because the Sub–Debt Holders will almost certainly receive no more than a few hundred thousand dollars, and may get nothing at all. This means that, by accepting the Plan, the Sub–Debt Holders are giving up their prior secured interest in the accounts receivable to the extent of the first $1.25 million and will have little hope of receiving more than a fraction of the amounts of their claims.

to unsecured claims by either agreement or Court order; Class IX: late and penalty claims; Class X: claims of the Debtor's partners, including claims for contribution and indemnification, but excluding the claims of Fair Recovery Contributors or Sub–Debt Holders discussed later; and Class XI: equity interests. In addition to these classes, the Plan also deals with post-petition administrative claims, § 507(a)(2) gap period claims, and § 507(a)(8) tax claims. The Class I priority claims and administrative claims are unimpaired. All other classes are impaired. Classes VIII through XI are not expected to receive any distributions.

4. The Participating Partner contributions to be collected by the Plan Administrator are based on a number of factors, including that particular partner's earnings during a specified period of time and each partner's liability as a guarantor on the lease covering the Chicago property subject to the Fair Recovery settlement. The aggregate of Participating Partner contributions is $3,673,980. The Plan Administrator will pursue Non–Participating Partners on their partnership liabilities for the Debtor's obligations.

Funds collected by the Plan Administrator from partners, whether Participating (who agreed to make contributions to the Plan) or Non–Participating Partners (who are potentially liable under partnership law for Keck's debts), are divided into two categories. If a partner was a guarantor on the lease at issue in the Fair Recovery litigation (a "guaranteeing partner"), a portion of the amount that partner pays to the Plan Administrator will go to the Class VII Fair Recovery Claimants ("the Fair Recovery Portion").[5] The Fair Recovery Portion, however, will be funded only by payments from guaranteeing partners and only after the guaranteeing partner has satisfied the *non*-Fair Recovery Portion. Hence, the Plan Administrator will first distribute funds collected from partners, in addition to amounts it receives from the Debtor, to the Class VI general unsecured creditors. With regard to collections from guaranteeing partners, however, the Plan Administrator will first distribute to Class VI general unsecured claimants only up to a certain amount, with the remaining later-collected Fair Recovery Portion payable to Class VII Fair Recovery Contributors. After unsecured creditors have received $3,311,966, one-half of further collected funds will be paid to the Sub–Debt Holders. Again, this scheme represents a concession by partners in favor of unsecured creditors. The principal quid pro quo received by the partners are the releases and injunctions discussed below.

### The Releases and Injunctions

The Plan provides an incentive for partners to contribute funds. In exchange for their contributions, the Plan grants Partic-ipating Partners releases from partnership liability, including obligations to other partners based upon partnership law. Non–Participating Partners and Participating Partners who default in their contributions do not receive the benefit of the releases and may still be held liable for any partnership obligation. In addition, the Plan provides for a release-related injunction enjoining "all persons or entities that have held, currently hold or may have asserted a Claim or an Equity Interest that is released or terminated . . . herein . . . from taking" essentially any action against Participating Partners based on a released claim or interest. (The Plan § 12.2.) Finally, the Plan states that pursuant to § 105, the Court will enter an order permanently enjoining

> *all persons and entities* including, without limitation, all Creditors, Accepting Creditors, Partners, [two identified attorneys referred to as 'Contract Partners'], Employees and holders of Future Claims (whether known or unknown), whether Released Parties or not, *from taking any action* . . . for the purpose of . . . collecting or receiving payment *on or with respect to any Claim, Partnership Debt or Equity Interest, or from seeking contribution, indemnity, or any recovery or other remedy relating to a Claim, Partnership Debt or Equity Interest from or against . . . any Participating Partner* . . . or . . . the Debtor.

(The Plan § 12.3 (emphasis added).) [6]

### The Voting Results

The Plan has been accepted by each class of creditors entitled to accept or re-

---

5. The amount each guaranteeing partner must tender "reflects 20% of his or her scheduled liability as a guarantor to the Chicago Landlord." (The Plan § 2.6). In addition, the Plan further provides that "[t]he total amount to be paid by all such [guaranteeing] Partners . . . is $362,014." (*Id.*) Therefore, although the Plan directs that Fair Recovery claims in excess of $500,000 to be subordinated, it appears that the most these claimants will receive is $362,014.

6. The Plan defines "Accepting Creditors" and "Released Parties" as follows:

'Accepting Creditor' means any Creditor that is tendered a distribution under the Plan and accepts such distribution.

· · · · ·

'Released Parties' means the Debtor, its estate, the Debtor–in–Possession, the Plan Administrator, each Accepting Creditor (who is not a Partner or Contract Partner), the

ject. Specifically, the Class II Bank Group accepted the plan. Of the seventy-eight voting Class III Sub–Debt Holders, seventy-seven, holding a total of $4,319,970 in claims, accepted the Plan. The dissenting Sub–Debt Holder's claim is for $40,000. Only two Class IV insurance claimants voted, and both accepted the Plan. Likewise, all fourteen voting Class V convenience claim holders accepted the Plan. In Class VI, fifty-eight general unsecured creditors, holding a total of $4,587,083.11 in claims, accepted the Plan; only one, holding a $1,210 claim, rejected. The Class VII Fair Recovery Contributors filed one acceptance. No acceptances or rejections were filed on behalf of the Class VIII subordinated claims. Only one Class IX late and penalty claim holder voted, and that claimant accepted the Plan. Ninety-six of the ninety-seven voting Class X Partner claimants accepted the Plan. The accepting Class X claim holders' claims totaled $6,281,750.86, and the dissenting claimant's claim is for $117,400. Similarly, seventy-three of the seventy-four voting Class XI equity interest holders accepted the Plan.

## DISCUSSION

### Classification

■ Mr. Dennis O'Dea is a Non–Participating Partner of the Debtor and the lone rejecting member of Class III, Class X and Class XI. He objects to confirmation of the Plan. Since Mr. O'Dea is a creditor of the Debtor, as well as a Partner, whose rights will most certainly be affected by the Plan, he has standing under § 1109 to object to confirmation of the Plan.

■ Mr. O'Dea objects to the separate classification of the Fair Recovery Contributor's claims.[7] "The plan proponent has broad discretion in classifying claims.... If the plan proponent can articulate differences among the claims-that is, if the plan proponent can demonstrate the lack of 'substantial similarity'-then separate classification is proper." *In re Bloomingdale Partners,* 170 B.R. 984, 996 (Bankr.N.D.Ill.1994). The Fair Recovery Contributors' claims are sufficiently different from other unsecured creditors to justify separate classification. First, the Fair Recovery Contributors are not only creditors, but also partners, of the Debtor. Second, these partners contributed funds in exchange for the guaranty that they would not be held personally liable for the Debtor's default to the Chicago landlord. These factors warrant placing these claims in a different class than those of other unsecured creditors who have no special relationship to the Debtor. Hence, Mr. O'Dea's challenge to the separate classification of Class VII claimants is overruled.

■ Conversely, Mr. O'Dea also argues that his Sub–Debt claim should be separately classified. "[A] plan may place a claim ... in a particular class only if [it] is substantially similar to the other claims of such class." § 1122(a). Commonly, each secured claim is placed in a separate class. But that is because usually each such claim is secured by distinct rights to property of

Bank Group, the Creditors' Committee and its members (solely in their capacities as members of the Creditors' Committee), the Sub–Debt Committee and its members (solely in their capacities as members of the Sub–Debt Committee, but including any individual whose professional corporation is a member of the Sub–Debt Committee), the Management Committee and its members (solely in their capacities as members of the Management Committee, but including any individual whose professional corporation is a member of the Management Committee), each Participating Partner and his or her professional corporation, if any, each

Professional Person retained in the Case pursuant to any of Sections 327, 1103 or 1104 of the Bankruptcy Code (solely in their capacities as Professional persons), and each of their respective attorneys, officers, agents and employees, including the Employees, but excluding any Non–Participating Partner and any Defaulting Partner. (The Plan at 5, 18.)

7. The Court ruled on this objection and several others during the series of hearings held on the Plan. Those oral rulings are incorporated into this opinion so that it will deal with all the issues raised by objections to the Plan.

the estate. Secured creditors typically have either liens on different assets, or, if their liens are on the same asset, one has a higher priority than the other. In this case, however, each Sub–Debt claim is secured by a common interest in the same collateral, and each Sub–Debt Holder has the same right to pro rata payment from that collateral. Hence, each Sub–Debt Holder is in the same relationship to the Debtor and its assets as all other Sub–Debt Holders. Therefore, these claims are substantially similar, and, accordingly, Mr. O'Dea's objection to their classification in a single class is overruled.

*The Best Interest of Creditors Test*

■ Mr. O'Dea next argues that the Debtor cannot satisfy the § 1129(a)(7) best-interest-of-creditors test. Section 1129(a)(7) provides that each holder of an impaired claim who has rejected a plan of reorganization must "receive or retain under the plan on account of such claim ... property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive ... if the debtor were liquidated under chapter 7 ... on such date." "The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan." *Bank of America Nat. Trust & Sav. Assoc. v. 203 N. LaSalle St. Partnership*, 526 U.S. 434, 119 S.Ct. 1411, 1415 n. 13, 143 L.Ed.2d 607 (1999). Mr. O'Dea argues that according to the testimony at the confirmation hearing and the Chapter 7 liquidation analysis included in the Plan's disclosure statement, he would receive fifty percent of his Class III Sub–Debt claim, which is better than he stands to receive under the Plan. Mr. O'Dea, however, omits from his analysis many factors that greatly increase the value of what the Class is getting under the Plan and reduce the amount each Sub–Debt Holder would receive in a chapter 7 case.[8]

■ First, Mr. O'Dea's Sub–Debt claim in isolation from all other Sub–Debt claims is valueless. Mr. O'Dea does not even have a security interest in any of the Debtor's assets. The rights of the Sub–Debt Holders are governed by subordinated loan and security agreements. These agreements, however, do not grant a security interest to each Sub–Debt Holder individually. Instead, the Debtor granted a security interest to a "Collateral Agent, for the ratable benefit of all Persons in whose name Subordinated Term Notes are issued...." (*See, e.g.,* Exhibit to Snyder Proof of Claim § 4.1.) Hence, Mr. O'Dea, like all Sub–Debt Holders, has no individual right to pursue his secured claim. In addition, the Collateral Agent cannot enforce the security interest "without the prior written consent of the Required Lenders...." (*Id.* at § 6.1.) "Required Lenders" is defined as "the Lenders listed on the signature pages ..., any assignees ... [or] ... successors of such Lenders ... and any Subordinated Note holder ... who together beneficially own at least sixty-five percent (65%) of the sum of the aggregate unpaid principal amount of the Subordinated Term Notes." (*Id.* at 2.) Therefore, a sixty-five percent majority in amount is needed to require the Collateral Agent to enforce the Sub–Debt claimants' claims.

The Plan represents a settlement of all claims against the Sub–Debt Holders, both in their capacity as Sub–Debt Holders and in their capacity as partners. More than the requisite 65% have accepted that settlement. Since Mr. O'Dea has no security interest in his own name and holds only a small fraction of the total unpaid principal amount, he would be powerless to enforce his rights in a chapter 7 case. Indeed, he would be at the mercy of the overwhelming majority that has already decided that their best interests are served by foregoing enforcement of their rights in favor of

---

**8.** No one contests that the best-interests-of-creditors test is satisfied for all other credi-

tors. The evidence overwhelmingly supports that conclusion.

a settlement such as is reflected in the Plan.

Moreover, other evidence establishes that the Plan satisfies the best-interests test with respect to Class III. The Court finds that the Sub–Debt Holders maximum possible recovery in a chapter 7 case would be about 39% of their claims, taking into account the additional administrative costs and difficulties of collection that would result from conversion to chapter 7. But other factors make it clear that any real recovery would be far less, and that Sub–Debt Holders would likely end up far worse off in a chapter 7 case than under the Plan.

First, the Sub–Debt Holders would certainly have to overcome the efforts of unsecured creditors and the trustee to subordinate their claims on equitable grounds. Based on the testimony of the Unsecured Creditors' Committee's chairman and a pleading filed by a creditor, Citizens Commercial Leasing Corporation, the risk would be more than trivial. In their countercomplaint, Citizens had alleged that when the Debtor's partners became aware of the Debtor's financial troubles, "they embarked on a series of actions designed to defeat their creditors and improperly direct money into their own pockets." (Citizen's Countercompl. at ¶ 23.) One of these improper actions, Citizens alleged, was to infuse the Debtor with additional capital "in such a way as to place themselves ahead of other partnership creditors. The mechanism they chose was contributing Individual Retirement Accounts to the firm and styling them as secured debt, subordinated only to" the Bank' Group's interest. (*Id.* at ¶ 24.) Further, according to the committee chairman, at the same time the loans were being transacted, and knowing the Debtor was insolvent, many Sub–Debt Holders shielded themselves from personal liability by incorporating and prevailing on creditors to forego any claims against them personally, without disclosing the Debtor's condition. Although the evidence is insuf-

ficient for this Court to make any judgment about the likely outcome of equitable subordination litigation, there is evidence of both the Debtor's weak financial condition at the time of the loans and specific conduct that could be construed as inequitable. The risk to the Sub–Debt Holders is therefore real. *See In re Lifschultz Fast Freight,* 132 F.3d 339 (7th Cir.1997).

In addition, because the chapter 7 trustee would likely bring the equitable subordination action, the estate would bear the prosecution costs, which would further reduce the Sub–Debt Holders' recovery, even if they prevailed. The value of any such recovery would also be reduced by the costs of defending against an equitable subordination action; the avoidance of that cost is a value Class III members will receive under the Plan.

The Plan provides for other benefits to the Sub–Debt Holders. With a great deal of luck, there may be a few hundred-thousand dollars to distribute on the Sub–Debt Holders' $4.3 million claim. So they may receive 5% to 10%, although they may receive nothing. The real value of the Plan to the Sub–Debt Holders, however, lies in the protection it affords them against future claims, in addition to the subordination claims. The Sub–Debt Holders are all former partners in the Debtor. In a chapter 7 case, a trustee would assert rights under § 723 against each of the partners. Most of the partners are professional corporations, and most of those may have only nominal assets, but that would not prevent litigation to test those corporate veils. Indeed, in chapter 7, this case would be a jungle of litigation that would take years to resolve. Even if the Sub–Debt Holders ultimately prevailed on all issues, the cost of "victory" would exceed what remained in the estate to distribute to them. On the other hand, defeat in that litigation could impose enormous liability. By giving the Participating Partners the option of contributing specified amounts, the Plan allows them to liquidate and resolve unknown but potentially

enormous exposure and avoid substantial costs.

The chairman of the Sub–Debt Holders' Committee testified that they agreed to the Plan in order to "purchase peace." All the Sub–Debt Holders are attorneys with enough experience, skill and sophistication to have been partners in a major law firm. They certainly know a lot about the Debtor, its assets, and its creditors, and about the value and merits of their own positions. They have been represented by a committee that has been active in this case and the negotiation of this Plan. Seventy-seven out of seventy-eight voting members of the class accepted the Plan. Of course, even under these circumstances, a dissenting class member is entitled to an independent judicial evaluation that does not take into account the evaluation arrived at by the majority. Otherwise, § 1129(a)(7) would be a meaningless protection for dissenters. Considering the risks and costs Plan implementation will avoid, however, the Court agrees with the majority that the value of the benefits to the Sub–Debt Holders under the Plan exceeds any amount they might receive in chapter 7.

*The Releases and Injunctions*

■ Mr. O'Dea also objects to the Plan's release and injunction provisions. These provisions are permissible under chapter 11, however, and, therefore, Mr. O'Dea's objection to them is overruled. In the Seventh Circuit, at a minimum, a Chapter 11 plan may provide for "consensual and non-coercive" releases. *See In re Specialty Equip. Co.,* 3 F.3d 1043, 1047 (7th Cir.1993). In *Specialty Equipment,* a plan of reorganization provided "that all creditors voting in favor of the Plan [w]ere deemed to give Releases to a number of third parties ... from any liability arising out of a relationship with the Debtors." 3 F.3d at 1045. Creditors objecting to the plan argued that such releases were "contrary to section 524(e)," which "provides in

relevant part that the 'discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.'" 3 F.3d at 1046 (quoting § 524(e)). The Seventh Circuit disagreed and found that § 524(e)'s language does not "preclude all releases that are accepted and confirmed as an integral part of a reorganization." *Id.* at 1047. The Seventh Circuit then stated that

> courts have found releases that are consensual and non-coercive to be in accord with the strictures of the Bankruptcy Code.... Unlike the injunction created by the discharge of a debt, a consensual release does not inevitably bind individual creditors. It binds only those creditors voting in favor of the plan of reorganization.

*Id.* Hence, in accordance with *Specialty Equipment,* creditors who affirmatively accept a plan are bound by its releases and injunctions.

■ Moreover, at least on the facts of this case, creditors who did not accept the Plan but do accept distributions under the Plan are bound by the release and injunction provisions. If plan distributions consist in substantial part of partners' contributions and if the best-interest-of-creditors test has been satisfied, as in this case, the *Specialty Equipment* standard of "consensual and noncoercive" releases is satisfied, rendering the releases and injunctions permissible. Both the substantial partner contributions and satisfaction of the best-interest-of-creditors test show that partners are giving, and creditors are receiving, good consideration, and that creditors are no worse off than they would have been without such a plan, taking into consideration the releases and injunctions. This is so because the best-interests test in a partnership bankruptcy takes into account the value of potential recoveries from partners by virtue of § 723.[9] Credi-

---

9. Section 723(a) states that

> [i]f there is a deficiency of property of the estate to pay in full all claims which are

tors who disagree with the valuations that result in a best-interests finding are free to refuse to participate in the plan and pursue partners. It is true that they would lose the benefit of partnership property, but the choice is nonetheless non-coercive so long as a substantial part of the distribution under the plan is not from partnership property.

▇▇▇ There is another category of creditors who, under Seventh Circuit authority, may be bound by the releases and injunctions contained in the Plan: creditors whose claims against the estate have been litigated and disallowed in this case. Under Seventh Circuit precedent and principles of collateral estoppel, such creditors may be enjoined from pursuing the same claims against the partners. In *In re Energy Cooperative,* the Seventh Circuit approved an injunction prohibiting creditors from pursuing claims owned by the bankruptcy estate against the owners of the debtor. 886 F.2d 921, 929 (7th Cir.1989). Although the doctrine of standing would have provided the debtor's owners in *Energy Cooperative* with a complete defense in any such action, the Seventh Circuit approved the issuance of an injunction, with the resulting possibility of contempt proceedings, to provide the owners with additional protection. "The power of the [bankruptcy] court under" § 105(a), the Seventh Circuit found, "includes the power to issue an injunction enjoining third parties from pursuing actions which are the exclusive property of the debtor estate and are dismissed pursuant to a settlement agreement." *Id.*[10] In this case, the doctrine of collateral estoppel would provide a complete defense to any partner who was sued on a claim against the Debtor partnership that had been disallowed by this Court. Under *Energy Cooperative,* the

additional protection of the releases and injunctions is permissible.

▇▇▇ The releases and injunctions in this case, however, bind all creditors and partners, and therefore go beyond the scope of the *Specialty Equipment* and *Energy Cooperative* opinions. Nevertheless, those Plan provisions may be included in a confirmed plan because they constitute a permitted impairment of claims and interests.

There is much discussion in the cases about § 524(e) of the Bankruptcy Code, but that section is not controlling, or even particularly relevant. As the court in *Specialty Equipment* noted, § 524(e) does no more than limit the effect of a discharge to the debtor. It does not prohibit other forms of relief. The real question is whether any provision of the Bankruptcy Code authorizes the releases and injunctions proposed here as part of a chapter 11 plan. That authority is in § 1123(b)(1), which authorizes a plan proponent to impair classes of claims or interests.

Section 1123(b)(1) provides that "a plan may ... impair ... any class of claims, secured or unsecured, or of interests." The definition of impairment is derived from § 1124, which states that a claim or interest is unimpaired if a plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." Therefore, § 1123 authorizes the alteration of legal rights to which a claim or interest entitles a claim holder. The question in this case then is whether the right to seek recovery from partners is a legal right to which a claim against the Debtor partnership or interest in the Debtor partnership entitles the holder of that claim or

---

allowed in a case under this chapter concerning a partnership and with respect to which a general partner of the partnership is personally liable, the trustee shall have a claim against such general partner to the extent that under applicable nonbankruptcy

law such general partner is personally liable for such deficiency.

**10.** Section 105(a) states, in pertinent part, that a bankruptcy "court may issue any order ... that is necessary or appropriate to carry out the provisions of this title."

interest or a right arising from a separate claim or interest.

 Under Illinois law, partners are liable for partnership debts, not by reason of any separate agreement or conduct, but by reason of § 15 of the Uniform Partnership Act, which states that partners are liable for wrongful acts "chargeable to the partnership" and for "all other debts and obligations of the partnership." 805 ILCS § 205/15. As stated by the Seventh Circuit, " 'partnership debts are debts of the members of the firm whose liability therefor is direct and primary.' " *Moseley, Hallgarten, Estabrook & Weeden, Inc. v. Ellis*, 849 F.2d 264, 271 (7th Cir.1988) (quoting *In re Bernstein*, 197 F.2d 378, 381 (7th Cir.1952)). *See also* Illinois Law and Practice § 142 ("[a] contract with a partnership binds each member of the partnership individually. . . .").

 This general principle was given specific application in *Home Savings of America v. The Inland Group, Inc.*, where the court held, "[s]ince a party cannot tortuously interfere with his or her own contract, . . . a general partner cannot be liable for tortuous interference with contract of the partnership." 1991 WL 270423, at 6, 1991 U.S. Dist. Lexis 17948, at *17 (N.D.Ill. Dec. 5, 1991) (citing *Battista v. Lebanon Trotting Ass'n*, 538 F.2d 111, 116–117 (6th Cir.1976)). In the course of reaching the same result, the *Battista* court of appeals said, "[a] corporation is generally recognized as a separate legal entity from its shareholders, officers and directors, but a partnership is not so considered." 538 F.2d at 117.[11] In addition, the liability of each partner for a partnership debt is the same as all the other partners. As one treatise noted,

[a]s to judgments rendered on joint and several obligations, judgments against one partner on his several liability does not operate to extinguish the liability of the other partners. The partners not sued in the first action may be sued subsequently, but the earlier action may have been conclusive on the question of liability.

Harold Gill Reuschlein & William A. Gregory, *The Law of Agency and Partnership*, § 206G (2d ed.1990).

The right to proceed against partners on a claim against a partnership, therefore, does not have any basis separate from the claim itself. It is a "legal right to which such claim or interest entitles the holder" of that claim, within the meaning of § 1124. As such, that right may be impaired under § 1123(b).

Bankruptcy law also supports this view and provides the necessary protection against abuse that would not be available in non-partnership cases. As explained above, § 723 authorizes a trustee in a partnership chapter 7 case to seek recovery for the benefit of partnership creditors from partners to the extent of non-bankruptcy law. Section 1129(a)(7)'s best-interests-of-creditors test, when considered together with § 723, assures that dissenting creditors and interest holders are receiving the full value of their claims and interests, including the value of their rights against individual partners. In effect, the Bankruptcy Code brings about a pooling of assets, as suggested in the *In re Heron, Burchette, Ruckert & Rothwell* opinion of Judge Teel, who approved a plan similar to this one. *See* 148 B.R. 660 (Bankr.D.C. 1992). Here, the releases and injunctions are consistent with and further that bank-

---

**11.** More recently, the same circuit reached a contrary result in *Life Care Centers of America, Inc. v. Charles Town Associates Limited Partnership*, 79 F.3d 496, 502–503 (6th Cir. 1996), but only because the entity involved was a limited partnership. The court there said, "[p]artnerships, unlike corporations, do not have a separate existence from the partners who form the partnership. . . . Instead, partnerships have traditionally existed by virtue of their partners' existence. *See* UNIFORM PARTNERSHIP ACT § 4 (1914) (death of any partner terminates partnership under Tennessee law). However, this traditional view of partnership as an 'aggregate' of individuals is not always adequate in the context of limited partnerships."

ruptcy policy of the pooling of assets in partnership cases.

Moreover, § 105(a) authorizes orders necessary to carry out the provisions of the Bankruptcy Code. Section 1123(b) permits plans to include provisions like the releases and injunctions at issue in this case. Section 1129 requires this Court to confirm a plan that satisfies the requirements of § 1129, and § 1141 binds creditors and general partners to a confirmed plan. The releases and injunctions requested here are necessary to carry out those provisions and well within the scope of the Seventh Circuit's *Energy Cooperative* decision.[12]

■■■■ Hence, all claim and interest holders, including Mr. O'Dea, are bound by the release and injunction provisions contained in the Plan. This is not to say, however, that a partner is protected from claims based on his or her own personal conduct. A right to recover from a guarantor of a debt of a debtor or a surety of a debtor could not be impaired by the debtor's plan because that right would not arise from the claim, but from the guarantee or surety agreement. In the same way, if a professional's negligent conduct causes an injury, that professional's liability arises from his or her conduct. If the professional is a member of a partnership, the firm will be liable for the professional's conduct, and the other partners will be liable, not because of their conduct, but solely because they are partners in that firm. The active tortfeasor's own liability,

however, would have a separate basis, and the claimant's right against the tortfeasor would not be a right to which the claim against the partnership entitles the claimant, but a separate right. A claim against a partner for his or her own wrongdoing does not result from, and is not dependent upon, a claim against the partnership. Therefore, the right to hold a partner accountable for his or her own conduct may not be affected by the Plan under §§ 1123 and 1124. The order of confirmation will clarify this point, so that there can be no doubt that the releases and injunctions are limited to claims arising solely from a protected partner's status as a partner, and under the Uniform Partnership Act, and not from any separate conduct or agreement on the part of the partner.

*The Self–Insured Retention*

As explained above, the Plan divides professional malpractice claims covered by liability insurance into two parts. These claimants will receive any applicable insurance proceeds as members of Class IV, and will have a Class VI general unsecured claim for any remaining liability. This claim bifurcation exists because two contested malpractice claims are currently pending to which a self-insured retention ("SIR") applies. Under the applicable policy, the SIR of $1 million for each claim must be "paid" by the Debtor before the insurance company is required to satisfy the remaining insurance obligation. The insurer, Attorneys' Liability Assurance So-

---

12. Mr. O'Dea raises two other objections to the Plan. First, Mr. O'Dea objects to the Plan's requirement that non-participating partners submit financial statements to the Plan Administrator. Bankruptcy Rule 1007(g) authorizes the Court to order "any general partner to file a statement of personal assets and liabilities." There is nothing in that rule that suggests that its application is limited, as O'Dea suggests, to chapter 7 cases. In addition, the obvious reason for this requirement is to aid the Plan Administrator in his collection efforts against NonParticipating Partners. Therefore, the disclosure requirement for Non–Participating Partners is not inequitable, as Mr. O'Dea also suggests; in-

stead, the requirement reflects the necessity of seeking information from only Non–Participating Partners. There is simply no reason to seek financial disclosures from partners who participate in the Plan. Second, Mr. O'Dea objects to the Plan's imposition of a penalty, by doubling the contribution amount, against any partner who participates in the Plan after confirmation but before the Plan's effective date. Mr. O'Dea does not cite, and the Court could not find, any Code section violated by this incentive provision. Mr. O'Dea chose not to participate in the Plan with full knowledge of this provision and, as such, assumed the risk that the Plan would be confirmed and his participation cost would double.

ciety ("ALAS"), objects to the Plan's treatment of the SIR.

While ALAS is not a creditor of the Debtor, it is a third party indemnitor with rights that might be affected by the bankruptcy. Under § 1109(d), "[a] party in interest ... may raise and may appear and be heard on any issue in a case under this chapter." The Seventh Circuit has explained that "all ... section [1109(d)] means is that anyone who has a legally protected interest that could be affected by the bankruptcy proceeding is entitled to assert that interest with respect to any issue to which it pertains...." *In re James Wilson Assocs.*, 965 F.2d 160, 169 (7th Cir.1992). The insurance contract is property of the estate, § 541(a)(1), and this Court must determine whether the Plan provides adequate means for its implementation, §§ 1123(a)(4), 1129(a)(1). The effect of the Plan on the SIR requirement is therefore a matter that this Court must decide. ALAS alleges that the Plan will impair and substantially modify its rights under the professional liability policies it issued to the Debtor. As contract rights are clearly "legally protected interests," ALAS has standing to object to the Plan. ALAS's objections, however, are limited to the plan provisions that allegedly affect its interests. *See In re B. Cohen & Sons Caterers, Inc.*, 124 B.R. 642, 647 (E.D.Pa.1991) ("[C]reditors lack standing to challenge those portions of a reorganization plan that do not affect their direct interest.").

ALAS alleges that its policy requires the Debtor to satisfy the SIR by the actual payment of $1 million on each claim before ALAS is obliged to pay anything. It complains that the Plan, by its treatment of insured malpractice claims and the release and injunction provisions, impermissibly allows the Debtor and its former partners to avoid the SIR obligations and requires ALAS to provide indemnification notwithstanding the Debtor's failure to satisfy the SIR. Further, ALAS says that there is no showing that the Debtor and its partners could not come up with $2 million to satisfy the SIRs in full.

The Court holds, however, that the SIR is satisfied by the Plan's grant to Class IV creditors of an unsecured claim for the SIR portion of their recovery and such creditors' acceptance of the Plan. ALAS will not be liable for any part of the SIR. Indeed, its exposure is not increased by a penny. ALAS is neither liable to the Class IV claimants for the SIR nor obligated to fund the costs of defending actions brought by these claimants until the SIR is satisfied. *See Home Ins. Co. v. Hooper*, 294 Ill.App.3d 626, 633, 229 Ill.Dec. 129, 691 N.E.2d 65, 70 (1998) (an insurer is not obligated to pay an insured's initial self-insured retention amount absent a "drop down" provision in the insurance policy).

The SIRs are to be satisfied in exactly the same way as every other unsecured claim against the Debtor. The policy condition to ALAS's liability that the Debtor "pay" costs and amounts due on the claim "as they become due" up to the amount of the SIR will be satisfied under the Plan. An obligation to pay is satisfied when something of value is given and accepted in full discharge of that obligation. *See Black's Law Dictionary* 1150 (7th ed.1999). That is what the Plan provides.

Nor is ALAS's practical risk increased by the Plan. Under the Plan, the Plan Administrator is charged with the task of defending malpractice actions, and ALAS is under no obligation to provide defense costs until the SIR is satisfied. The Plan Administrator has every incentive to adequately defend malpractice actions. Failure to defend in good faith might result in the loss of coverage by ALAS, which would have a devastating effect on creditors to whom the Plan Administrator owes a duty. Moreover, if a claim can be defeated or settled for less than the remaining SIR, those creditors will receive a larger distribution.

In addition, a second, independent reason exists for overruling ALAS's objection.

The insurance policies contain a clause entitled "Bankruptcy and Insolvency", which states that "[t]he bankruptcy or insolvency of the FIRM or any other ASSURED shall not relieve the Company of its obligation to pay claims made under this Policy." The Plan proponents argue that both this policy language and Illinois law require ALAS to pay any amount in excess of the SIR regardless of whether the SIR is satisfied in full.

Section 388 of the Illinois Insurance Code provides:

No policy of insurance against liability or indemnity for loss or damage to any person other than the insured, for which any insured is liable, shall be issued or delivered ... unless it contains in substance a provision that the insolvency or bankruptcy of the insured shall not release the company from payment of damages for injuries sustained.

215 ILCS § 5/388. In *Home Insurance,* the Illinois Appellate Court applied § 388 and held in a case with facts similar to those present here that an insurer was required to pay claims in excess of a SIR when insolvency prevented the insured from satisfying the SIR condition. ALAS argues that *Home Insurance* is inapposite because it involved a chapter 7 case where it was shown that the insured could not satisfy the SIR. In contrast, ALAS argues, no showing has been made in this case that the SIR cannot be satisfied by the former partners in the Debtor. In addition, ALAS argues that neither § 388 nor *Home Insurance* applies to ALAS because it was an Illinois captive insurance company subject to other Illinois statutory provisions at the time the policy was written.

Regardless of the type of insurance company ALAS was at the time it issued the policy, the *Home Insurance* court has construed language almost identical to that contained in the policy and found that an insurance company could not escape liability because of the insured's bankruptcy. There is no reason to believe that an Illi-

nois court confronted with the Bankruptcy and Insolvency clause contained in the policy at issue here would not interpret the language the same way.

Further, two additional reasons exist for rejecting ALAS's argument that *Home Insurance* is distinguishable. First, *Home Insurance* was concerned about the effect of bankruptcy on an insurance policy that contained an SIR provision, not about the insured's ability to pay. The Illinois Appellate Court specifically stated that the insurer was "obligated to indemnify ... [the insured], *irrespective* of ... [the insured's] inability to pay the claimed retention amount." *Home Ins.,* 294 Ill.App.3d at 633, 229 Ill.Dec. at 132, 691 N.E.2d at 70 (emphasis added).

Second, even if *Home Insurance* required the showing of an inability to pay, that showing has been made in this case. This is so because *all* unsecured creditors would have to be paid in full in order for the SIR to be paid in full. The insurance claimants stand on no different footing than other general unsecured creditors. Whatever funds come into the estate, whether in a chapter 7 or a chapter 11 case, must be distributed ratably among those creditors, after payment of prior and secured claims. This Court has already found (and nobody disagrees) that unsecured creditors will receive more under the Plan than in a chapter 7 case. Because those creditor claims will not be fully satisfied and because the best-interest-of-creditors test has been satisfied, it necessarily follows that the SIR cannot be paid in full. Hence, both because the Plan does satisfy the SIR condition and because of the policy's bankruptcy and insolvency provision, the Plan's treatment of the SIR obligation is consistent with the terms of the policy and is therefore permissible.

*Good Faith*

ALAS is the only party to challenge the Plan Proponents' good faith.[13] In addition, the only basis for ALAS's good faith chal-

---

**13.** Under § 1129(a)(3), a court may only con-

firm a plan if it "has been proposed in good

lenge is alleged discussions between the Plan Proponents and Security First Bank, one of the two Class IV malpractice claimants. ALAS believes that these discussions, alleged to have been made for the purpose of gaining Security First's Plan acceptance, resulted in two changes to the Plan which ultimately prejudiced ALAS.

First, ALAS argues that the Plan eliminates its right to approve settlements of any claims provided by the policy. The Plan language troubling ALAS states that "the Plan Administrator is authorized to take any and all actions necessary or appropriate to litigate, settle or otherwise resolve either [malpractice] Claim." (The Plan § 4.3.) Contrary to ALAS's assertions, this Plan provision merely grants the Plan Administrator the authority to take all steps necessary to settle claims, one of which is presumably to seek ALAS's consent to settle as mandated by the policy.

 Second, ALAS contends that Plan language which provides that "[a]ny insurance-related or insurance coverage dispute(s) may be determined" by this Court might be construed as allowing this Court to ignore ALAS's right, under the insurance policy, to arbitrate any coverage dispute. (*See* The Plan § 4.3.) In the same Plan section, however, the Plan provides that nothing within that section "shall preclude any insurer from seeking to enforce any right of arbitration set forth in an applicable Insurance Policy." (*Id.*) Therefore, whatever arbitration rights ALAS

has under the insurance policy are unaltered by the Plan. Since ALAS's only good faith objection was based on the erroneous assumption that these Plan provisions prejudiced its rights, the Court overrules that objection.[14]

## CONCLUSION

In many respects, this bankruptcy has been the quintessential chapter 11 case even though the Debtor will not continue operations. It presents complex disputes, competing interests and insufficient resources to satisfy all claims. Those problems have been resolved with a Plan that results from intensive negotiations among the Debtor, its creditors, equity holders, and other parties in interest and accepted by almost all those parties. In addition, the case contains another quintessential bankruptcy characteristic—the classic holdout. As counsel for the Unsecured Creditor's Committee described it:

> It is a plan that is the result of negotiations between two official committees and the debtor. It is a plan that is the joint plan of the Creditor's Committee and the debtor. It is a plan that had the support of every unsecured creditor in this case but for one creditor with a claim of approximately $1,000. It is a plan that had the support of every interest holder in this case but for Mr. O'Dea.

(Tr. Nov. 2, 1999, at 7.)

 Chapter 11 has as its central goal the resolution of competing claims to

---

faith and not by any means forbidden by law."

**14.** ALAS's attorney conceded this point in his closing arguments at the confirmation hearing when he stated, "I acknowledge that if the Court concludes that the plan sufficiently satisfies ALAS' concern with respect to consent to settle and arbitration, then I suppose the Court can conclude that whatever the original intent of the plan proponent, that that has been cured by the changes." (Tr. Nov. 2, 1999, at 26.) ALAS makes one additional objection to the Plan based on the releases and injunctions. ALAS affirmatively asserts that the releases and injunctions do not apply to any claim it may have against a partner

under the policy for, for example, fraud or collusion because it is a post-confirmation creditor. Whether ALAS is a pre- or post-confirmation creditor, or a creditor at all, cannot possibly be determined at this time because ALAS has not asserted any claims against the Debtor or any of its partners. If it is later determined that ALAS has a claim that arose post-confirmation, then it would be true that ALAS would not be covered by the release and injunction provisions. If, however, it is later determined that ALAS has a claim that arose pre-confirmation, then ALAS, like all other pre-confirmation creditors, would be subject to those provisions.

scarce resources by a negotiated plan—a contract. Chapter 11 provides for the binding effect of the contract on all creditors and interest holders, even if one or more have withheld their consent, § 1141, provided the interests of the holdouts have been protected by full compliance with the requirements of § 1129.

Mr. O'Dea has ably and vigorously fulfilled the role of the classic holdout, but his objections, and those of ALAS, are insufficient to block approval of the otherwise consensual resolution of a tangled web of difficult problems. Through their considerable skill, expertise, diligence, and, most importantly, willingness to negotiate, the parties and their attorneys have resolved those problems by proposing and supporting a plan that fully satisfies the requirements of § 1129. The Plan will be confirmed.